FILED

04/06/2018

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 1, 2017

IN RE B.L., ET AL.

Appeal from the Juvenile Court for Marion County
No. 23-73B   Ronnie J. T. Blevins, II, Judge

_____

No. M2017-01252-COA-R3-PT

_____

In this termination of parental rights case, the Department of Children's Services filed a petition to terminate the rights of J.R.L. (mother) with respect to her two children, B.M.L. and Z.A.L (the children). DCS alleged four grounds for termination: (1) abandonment by failure to support; (2) failure to provide a suitable home; (3) substantial noncompliance with a permanency plan; and (4) persistence of conditions. DCS did not seek in the trial court to support the ground of failure to support. The court found clear and convincing evidence of (1) mother's failure to provide a suitable home; (2) mother's failure to substantially comply with the permanency plan; and (3) persistence of conditions. The court also found clear and convincing evidence that termination is in the best interest of the children. Mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which W. NEAL MCBRAYER and ARNOLD B. GOLDIN, JJ., joined.

Cara Rains Sapp, Jasper, Tennessee, for the appellant, J.R.L.

Herbert H. Slatery III, Attorney General and Reporter, and W. Derek Green, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

## I.

DCS became involved in this case because mother and the children were among seven people living in a small travel trailer. The living conditions were unsanitary. At trial, mother admitted that the camper was "in horrendous condition . . . just a crazy way to live." DCS filed a petition for temporary custody of the children. Mother failed to appear at the scheduled hearing. It was reset by the court. Two days before the new hearing date, DCS received a referral that mother and the children were homeless. DCS arranged for them to stay at a hotel temporarily. On August 17, 2015, the children were adjudicated dependent and neglected and placed in DCS custody.

On September 1, 2015, DCS developed a permanency plan with mother's participation. The overall focus of the plan was on mother's lack of appropriate housing and stable employment. The initial permanency plan required: (1) mother to submit to drug screens; (2) that any adult living with mother be subject to drug screens; (3) that mother submit to a background check; (4) that any adult in mother's home submit to a background check; (5) that mother complete a parenting class; (6) that mother maintain a home for at least three months without moving; and (7) that mother ensure that the residence be free of all safety hazards, cleaned regularly, and baby-proofed. The permanency plan was later revised to add the following requirements: (1) that mother have legal, verifiable income; and (2) that mother demonstrate good hygiene for the children.

After the permanency plan was developed, suitable housing remained an issue for mother. At one point, mother lived in a house that did not belong to her, preventing DCS from performing random home visits. Mother also never asked DCS to perform a safety inspection of the home to determine if it met its minimum safety requirements. Subsequently, mother moved into her father's home. That home was unsuitable because it had structural problems, such as the floors falling through. Mother later moved to Georgia. The home in Georgia was not suitable because it lacked outlet covers and cabinet locks. Mother then returned to her father's home that had previously been determined unsuitable. Later, mother again returned to Georgia. That house was unsuitable because there were concerns about her roommates who refused to submit to background checks, and the home was cluttered and messy.

On November 4, 2016, DCS filed a petition to terminate mother's parental rights. As grounds for termination, DCS alleged the following: (1) abandonment by failure to support pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(i); (2) failure to provide a suitable home pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(ii); (3) substantial noncompliance with the permanency plan pursuant to Tenn. Code Ann. §§ 36-1-113(g)(2) and 37-2-403(a)(2)(C); and (4) persistence of conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3).

The trial court found that "no proof was put on regarding child support" and dismissed that ground. With respect to the failure to provide a suitable home, the court found the following:

> [Mother] did not provide a suitable home during the first four months of removal after assistance by DCS. In fact, she never provided a suitable home in the year and a half duration of this case, leading to this termination proceeding. DCS utilized reasonable efforts from the very beginning to assist the mother through housing and employment information. They provided transportation, even 4 gas cards. They encouraged her not to move to Georgia, due to difficulty to assist, and encouraged her to move back to Tennessee after she was denied by Georgia through the ICPC. The mother refused to heed the advice not to move, nor move back.

> The mother has shown a total lack of concern for making reasonable efforts for reunification. She refused assistance when she was homeless in Pikeville. She refused to fill out an application for the housing authority provided by representative Jerry Walker. She quit her employment at a nursing home, knowing the importance to establish stability and have income for housing. She refused financial assistance from DCS, which would have assisted her in establishing a residence. Her testimony was that, the only residence she thought was appropriate was on Cherry Street in Dunlap. For some unfathomable reason she never notified DCS that she obtained such housing, or could not remain there. She still, as of the hearing upon February 7, 2017, she had just moved back to Tennessee, and has not obtained suitable housing.

> The children have been in state custody for a year and a half, and are in need of stability and permanency. The mother has shown that she is no closer to stability of employment or residence, than she was the day the children came into state custody.

The trial court also found that mother failed to substantially comply with the permanency plan. With respect to that ground, the trial court stated the following:

> [Mother] knew that all she needed to do was have appropriate housing. She never did so. She moved numerous times.

Still, at the end of the hearing, she was instable, with no housing, again living with someone for a temporary duration. This has been her pattern throughout the case. She never maintained employment for any duration.

The court also found that the conditions leading to the removal of the children still persisted. The court noted that "[t]here is no likelihood of any early remedy of conditions. There is an adoptive home ready and available for permanency for the children."

With respect to the children's best interest, the trial court found as follows:

[T]he best interest for the children to have permanency and stability is to be adopted into an available loving and available home. The matter is by law, viewed from the children's perspective, now that the statutory grounds have been clear and convincingly met. Visitations by the mother were disruptive. . . . Any bond that exists between the children and the mother is natural but surmounted by a loving home where they have bonded for quite some time. They call the foster mom, mom. In essence, this is the children's chance to have a normal future.

Mother appeals.

## II.

Mother raises the following issues on appeal:

Whether DCS made reasonable efforts to reunite mother with her children.

Whether the trial court erred in finding clear and convincing evidence to terminate mother's rights on the ground of failure to substantially comply with the permanency plan.

Whether the trial court erred in finding clear and convincing evidence to terminate mother's rights on the ground of persistence of conditions.

Whether the trial court erred in finding that clear and convincing evidence supports a finding that termination of mother's parental rights is in the best interest of the children.

- 4 -

DCS raises the following additional issue of whether mother's notice of appeal is jurisdictionally deficient because she did not sign the notice pursuant to Tenn. Code Ann. § 36-1-124(d). This issue, however, has recently been resolved in mother's favor by the Supreme Court.[1]

## III.

A parent has a fundamental right, based on both the federal and state constitutions, to the care, custody, and control of his or her child. *Stanley v. Ill.*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996). While this right is fundamental, it is not absolute. The State may interfere with a parent's rights in certain circumstances. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has listed the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and a parent's rights may be terminated only where a statutory basis exists. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In the Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and convincing standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

Once a ground for termination is established by clear and convincing evidence, the trial court conducts a best interest analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)). "The best interest[ ] analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *Id.* at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT,

---

[1] In *In re Bentley D.,* 573 S.W.3d 907, 914 (Tenn. 2017), the Supreme Court stated that "the signature requirement of Tennessee Code Annotated 36-1-124(d) does not require a notice of appeal to be signed personally by the appellant. Because the timely notice of appeal signed by Father's attorney satisfies the signature requirement, we hold that Father's notice is not subject to dismissal."

2006 WL 1749534, at *6 (Tenn. Ct. App., filed June 26, 2006).

We are required to review all of the trial court's findings with respect to grounds and best interest. *In re Carrington*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest[ ], regardless of whether the parent challenges these findings on appeal.").

The Supreme Court has stated our standard of review:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*Id.* at 523-24 (internal citations omitted). "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to . . . the trial court's factual findings." *In re Adoption of S.T.D.*, No. E2007-01240-COA-R3-PT, 2007 WL 3171034, at *4 (Tenn. Ct. App., filed Oct. 30, 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

## IV.

## A.

Tenn. Code Ann. § 36-1-113(1) allows a court to terminate parental rights when a parent abandons the child as defined in Tenn. Code Ann. § 36-1-102. That section

defines abandonment to include the following:

> The child has been removed from the home of the parent . . .
> as a result of a petition filed in the juvenile court in which the
> child was found to be a dependent and neglected child . . . and
> for a period of four (4) months following the removal, the
> department . . . has made reasonable efforts to assist the
> parent . . . to establish a suitable home for the child, but that
> the parent . . . ha[s] made no reasonable efforts to provide a
> suitable home and have demonstrated a lack of concern for
> the child to such a degree that it appears unlikely that they
> will be able to provide a suitable home for the child at an
> early date.

The trial court adjudicated the children dependent and neglected, and they were taken into DCS custody on August 17, 2015. As a result, the relevant four-month period we must examine in order to establish abandonment by a failure to provide a suitable home is August 18, 2015 to December 17, 2015. During that time period, DCS made reasonable efforts to assist mother in securing suitable housing by (1) informing mother about services that the local Housing Authority and Southeast Tennessee Human Resource Agency could offer in helping her secure housing; (2) providing mother a list of trailers for rent and giving her a personal recommendation to the landlord; (3) offering to help mother with her first month's rent if she could demonstrate an ongoing ability to pay rent; and (4) being available to inspect mother's home when it was ready and request background checks for any roommates.

Mother, however, did not make reasonable efforts of her own. Instead, mother declined to apply for housing, claiming that the waiting list for those places was too long. Following removal, mother reported that she was living in Dunlap, Tennessee, but DCS could not perform random visits at that location because it did not belong to mother. Furthermore, mother never advised DCS that the home could be inspected to verify if it met DCS's minimum safety requirements nor did she seek background checks of her roommates. Thus, even though mother claims she had acquired a suitable home, the facts do not support that statement. Mother later moved into her father's home. That home was unsuitable. With respect to that home, mother testified that "it wasn't going to pass and I didn't like the idea of putting my two small children in a house with the floors falling in." Despite DCS urging mother to stay in Tennessee so that it could assist mother, mother moved to Georgia. When mother first moved into a home there, her roommate refused to submit to a background check.

Mother's failure to provide a suitable home has been an ongoing issue throughout the duration of this case. It is clear that DCS made reasonable efforts to assist mother in securing a suitable home during the relevant period of time. Mother, however, claims

- 7 -

that DCS failed to make reasonable efforts to assist her and actually hindered her ability to secure appropriate housing. This assertion is not supported by the record before us. "DCS's efforts do not need to be 'Herculean.' . . . DCS does not bear the sole responsibility." ***In re Hannah H.***, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App., filed June 10, 2014). The record demonstrates that DCS did in fact make reasonable efforts to assist mother but was hindered by mother's failure to make efforts of her own. "The efforts of [DCS] to assist a parent . . . in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent . . . toward the same goal . . . ." Tenn. Code Ann. § 36-1-102(1)(A)(ii). The evidence demonstrates that mother failed to provide a suitable home despite reasonable efforts by DCS. We hold, as a matter of law, that this ground is supported by clear and convincing evidence.

## B.

Tenn. Code Ann. § 36-1-113(g)(2) provides that parental rights may be terminated when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part[.]" Tenn. Code Ann. § 37-2-403(a)(2)(C) provides, in pertinent part, the following:

> Substantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights, notwithstanding other statutory provisions for termination of parental rights, and notwithstanding the failure of the parent to sign or to agree with such statement if the court finds the parent was informed of its contents, and that the requirements of the statement are reasonable and are related to the remedying the conditions that necessitate foster care placement.

With respect to substantial compliance, the Supreme Court has stated the following:

> Substantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. Black's Law Dictionary defines "substantial" as "[o]f real worth and importance." Black's Law Dictionary 1428 (6th ed. 1990). In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to the requirement.

- 8 -

***In re Valentine***, 79 S.W.3d 539, 548 (Tenn. 2002).

The permanency plan was developed with mother's participation. As noted in this opinion, mother's responsibilities established in the permanency plan included (1) maintaining a home for at least three months without moving; (2) ensure the home is safe for the children; (3) cooperate with background checks of mother and any adult in the home; and (4) have legal, verifiable income. Based upon DCS's primary concern that the family lacked stable housing, these responsibilities are reasonable and related to the conditions that led to the removal of the children.

The evidence demonstrates that mother failed to substantially comply with the statement of responsibilities set forth in the permanency plan. In this case, mother's degree of noncompliance was substantial, especially with respect to the factors that should be assigned significant weight. As discussed in this opinion, mother struggled with appropriate housing throughout the duration of this case. Mother lived in a home at the time the children were removed and never asked DCS to inspect that home. Mother testified that because the children were removed from there, "I just figured there was something wrong." Mother moved from unsuitable home to unsuitable home. Mother claims that she fulfilled the responsibility that she maintain a home for three months without moving when she lived for approximately seven months off of Gulch Road in Trenton, Georgia. The record, however, demonstrates that the home failed DCS inspection. It was denied by DCS due to concerns about the roommates in the home. Mother then moved into the home with her father that she admitted was unsuitable. Mother has failed to demonstrate the she substantially complied with the provisions in the permanency plan related to housing. She moved around from unsuitable home to unsuitable home; she never attained safe housing for the children; and there were struggles with some roommates and securing background checks on them.

In addition to failing to solve her housing issues, mother also had ongoing employment struggles. At the time the children were removed, mother was unemployed. Mother performed some work doing tattoos, but she testified that doing tattoos would not provide enough money to care for the children. Mother also did some babysitting for a time. That income, however, was hard to verify and limited as far as stability and the ability to support the family. Mother obtained employment at a nursing home. She held that job for two months but quit that job due to an issue with a coworker. DCS explained that stable employment would allow it to pay mother's first month of rent and put mother in a position to maintain a suitable home. Mother, however, failed during the duration of this case to secure the stable employment that would enable her to establish and maintain a suitable and stable home for the children.

Mother's responsibilities in the permanency plan focused on mother's lack of a suitable home for the children. During the duration of this case, mother had failed to take the steps to have a secure and stable income that would enable her to provide for her

family. This also affected her ability to secure stable and suitable housing. Mother's noncompliance goes to the heart of the permanency plan and the factors that should be given great weight. We hold, as a matter of law, that clear and convincing evidence supports a finding that mother failed to substantially comply with the permanency plan.

## C.

The trial court found clear and convincing evidence of persistence of conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3), which provides as follows:

> The child has been removed from the home of the parent . . . by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent . . . still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
>
> (C) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

As we have discussed, the conditions that led to the removal of the children involved a lack of appropriate housing for the children. Prior to the removal of the children, mother was found in a travel trailer with unsanitary living conditions, was found homeless, and did not have a place of her own for the children. Mother's housing woes have persisted throughout this case. Mother has failed to make the changes and put forth the effort that would demonstrate that the children could safely return to her care. The conditions that have plagued mother still persist such that the child would likely suffer further abuse or neglect if returned to mother's care. Mother's history demonstrates that it is unlikely that the children could be safely returned to mother in the near future. She has had ample time to address the conditions that led to the removal of the children but has failed to make progress such that the children could be safely returned to her. The children's foster parents hope to adopt them, and removing the children from that family and placing them with mother greatly diminishes the chances for the children of early integration into a safe, stable, and permanent home. The record before us demonstrates that mother has not improved the conditions that led to the removal of the children. She has failed to make the changes that would allow her to be reunited with the children. We

hold, as a matter of law, that the persistence of conditions that led to the children's removal has been proven by clear and convincing evidence.

## V.

## A.

Since we have found statutory grounds warranting the termination of mother's parental rights, we now focus on whether termination is in the best interest of the children. When considering the issue of "best interest," we are guided by the following statutory factors as set forth in Tenn. Code Ann. § 36-1-113(i), which provides:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1)   Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interests to be in the home of the parent or guardian;
>
> (2)   Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3)   Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4)   Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5)   The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6)   Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7)   Whether the physical environment of the parent's or

guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)   Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

"The above list is not exhaustive[,] and there is no requirement that all of the factors must be present before a trial court can determine that termination of parental rights is in a child's best interest." **State Dep't of Children's Servs. v. B.J.N.**, 242 S.W.3d 491, 502 (Tenn. Ct. App. 2007) (citing **State Dep't of Children's Servs. v. P.M.T.**, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at *9 (Tenn. Ct. App., filed Sept. 15, 2006)). In addition, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." **In re Marr**, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005) (citing **White v. Moody**, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

## B.

The trial court held that termination of mother's parental rights is in the best interest of the children. The court concluded that "[i]n essence, this is the children's chance to have a normal future."

The evidence does not preponderate against the trial court's findings of fact relative to the best interest factors. Mother has not made an adjustment of circumstance, conduct, or conditions so that it would be safe and in the best interest of the children to return to her. Her circumstances and conditions have remained the same. She has failed to secure suitable housing or a stable job so that she could provide for the children. She has failed make adjustments to her situation, even after DCS has made reasonable efforts to help her make the necessary changes. She has continued the same patterns from the beginning of this case. Mother does not appear to have a meaningful relationship with the children. While she has had visits with the children, the visits seemed to disrupt B.M.L. The foster mother reported that B.M.L. had trouble sleeping and cried after the visits. B.M.L. seemed to do better after visits were reduced from two hours to one hour. The children seem to have developed a strong relationship with the foster parents and consider them to be their parents. Changing their caretakers at this time would in all

likelihood negatively affect the children emotionally and psychologically. It would be a detriment to the children to remove them from a home where they are receiving safe and stable care and supervision in a safe and stable home. Based upon the foregoing, we hold, as a matter of law, that the trial court's "best interest" finding is supported by clear and convincing evidence.

## VI.

The judgment of the trial court is affirmed. The costs on appeal are assessed to the appellant, J.R.L. This case is remanded for enforcement of the trial court's judgment and for collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE